UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL M. ROSENBAUM | Case No. 21 CR 239<br><br>Judge Manish S. Shah |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by Morris Pasqual, Acting United States Attorney for the Northern District of Illinois, hereby presents its sentencing memorandum for defendant Daniel M. Rosenbaum. For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range, which the government submits is 135 to 168 months' imprisonment.

**Introduction**

Starting no later than November 2016, Rosenbaum began using his insurance brokerage business to defraud some of his clients. From that time and continuing until even after he was indicted in this case, Rosenbaum collected annuity premiums from certain clients—including family members, friends, romantic partners, and even his own housekeeper—for policies that he never purchased. Instead, Rosenbaum used those funds for himself to support a lifestyle that he could not legitimately afford.

To fool his clients into thinking that he was using their money to purchase real annuities or investments from reputable insurance companies, Rosenbaum created

and provided to his clients fake annuities listing the clients as the insureds. In doing so, he sometimes cut and pasted the logos of insurance companies or the insurance numbers of a legitimate annuity onto fake policies that he prepared. He did this so that his clients thought they had annuity coverage and so that he could continue to collect their funds to use for his own personal benefit by having them invest in additional annuities or other investments.

This misconduct was serious on a number of levels. First, Rosenbaum was lying directly to his clients with the intent to defraud them. However, not only was Rosenbaum stealing his clients' money, but he was also leaving them without the annuity coverage they expected to have. As set forth in greater detail below, without that coverage, a number of his clients suffered substantial financial hardship.

To make matters worse, Rosenbaum engaged in this fraud even after he was arrested and indicted and while subject to pretrial release conditions imposed by the Court, including the condition that he not engage in any further criminal conduct. This shows Rosenbaum's total lack of respect for this Court and the law, and his unwillingness to comprehend just how serious his actions were. Indeed, this Court revoked Rosenbaum's bond and ordered in January 2023 that he be detained due to that misconduct.

And importantly, Rosenbaum's fraud was not limited to the fake-annuity scheme. At the same time he was stealing his clients' money, he also filed (a) three fraudulent Paycheck Protection Program (PPP) loan applications in his name and the names of two close family members (unbeknownst to them), for which he was paid a

total of $53,537 that he used for his personal benefit, and (b) two fraudulent applications for unemployment insurance benefits in his name and the name of a close family member (unbeknownst to her), for which he was a paid a total $65,826 that he used for his personal benefit.

Given the nature and breadth of the many frauds Rosenbaum committed over a period of six years, including while he was on pretrial release, a sentence within the applicable Guidelines range is appropriate in this case. Such a sentence would provide just punishment to Rosenbaum, promote respect for the law, and serve to deter others from engaging in fraudulent criminal conduct.

## Background

### A. Offense of Conviction

As noted in the Presentence Investigation Report (PSR), plea agreement, and Government's Version of the Offense, during the relevant time period, Rosenbaum was a licensed insurance provider in Illinois who owned and operated Alexander & Rosenbaum Financial Group LLC ("Alexander & Rosenbaum"), which was based in Kenilworth, Illinois. Alexander & Rosenbaum operated as an insurance agency that obtained quotes for insurance products from insurance companies on behalf of clients. Rosenbaum acted as an insurance broker, that is, a representative of Alexander & Rosenbaum who obtained quotes for insurance products from insurance companies on behalf of clients. One of the insurance products that Rosenbaum brokered for Alexander & Rosenbaum clients was an annuity, an insurance product for which a

policy holder paid one or more monetary premiums to an insurance company in exchange for the right to receive a later payment or series of payments.

Beginning no later than November 2016, Rosenbaum falsely told some clients that he would purchase annuities for them when he knew that he would not purchase such annuities and instead would convert the money his clients paid him for the annuities to his personal use. When a client elected to purchase an annuity brokered by Alexander & Rosenbaum, Rosenbaum invoiced the client for the premium amount that he represented to the client would be used as payment to an insurance company for the annuity and Rosenbaum collected the payment the client made by check or wire transfer. However, Rosenbaum did not use the funds obtained from some of his clients towards the annuity premiums to insurance companies. Instead, he converted premiums made by clients for those annuities to his own personal use. Because Rosenbaum did not forward annuity premiums he collected from some clients to the insurance companies, the insurance companies did not issue annuities for those clients, and the clients were not covered by the annuities that they thought they purchased.

Some of the clients from whom Rosenbaum fraudulently collected annuity premiums were (a) over 70 years old, including Victim C (as referenced in the indictment), who was 84 years old at the time Rosenbaum fraudulently collected annuity premiums from Victim C, (b) were looking to purchase annuities to cover certain end-of-life expenses, and (c) were particularly susceptible due to their age,

4

among other things, to Rosenbaum's scheme of fraudulently inducing clients to purchase annuities and converting annuity premiums to his own personal use.

Furthermore, to deceive his clients into thinking that he had actually purchased annuities for them, Rosenbaum provided some of them copies of fake annuity contracts and statements that purported to represent the existence of legitimate annuities from insurance companies when there were no such annuities. Rosenbaum created those documents and knew that they were fraudulent because the documents had not been issued by the insurance companies reflected on the face of the documents and because he had not obtained annuities from insurance companies for those clients. An example of one such fake document is attached hereto as Exhibit A.

When clients confronted Rosenbaum about the existence of the annuities they thought he had purchased for them, Rosenbaum lied to the clients, telling them he would check with the insurance companies about the annuities he claimed he purchased for them or promising to pay them back with interest if they did not contact law enforcement about the money he owed them.

Rosenbaum converted or attempted to convert annuity premium payments made by at least 18 clients to his own personal use, and the total amount of funds that he converted or attempted to convert in this manner was at least $1,090,817. Some of the clients were fortunately able to stop the payments they made to Rosenbaum or Rosenbaum paid them back with annuity premiums he fraudulently

collected from other clients. As a result, the total amount of funds he converted and failed to pay back to 13 of those clients was $805,509.

Rosenbaum used premiums that he fraudulently collected from clients for his own personal benefit, including, among other things, making cash withdrawals, spousal and child support payments, credit card, car, and loan payments, and retail purchases at stores such as Jared Jewelry.

### B. Stipulated Offense #1

Rosenbaum did not stop committing financial fraud after he was charged in this case. He lost his insurance license in 2020 as a result of the conduct referenced above. PSR ¶ 94. Undeterred by the loss of his license or the Court's pretrial conditions of release that he not be involved in the insurance/investment business and not violate federal law while on release, Rosenbaum continued his fraud by stealing from two additional victims. Specifically, between June 2021 and December 2022, while on pretrial release, Rosenbaum fraudulently represented to two individuals he knew, Clients A and B, that he was a licensed insurance broker through an insurance agency he owned named Rosenbaum Family Planning, when, in fact, Rosenbaum knew that he was no longer a licensed insurance broker. When Clients A and B expressed an interest to Rosenbaum about purchasing annuities and/or making investments, Rosenbaum collected money from Clients A and B that he did not use to purchase annuities or make investments, opting instead to use that money for his own personal benefit (e.g., making spousal and child support payments, credit card payments, and car payments).

6

As he did with prior clients, Rosenbaum lied to Clients A and B concerning repayment of their funds and why Clients A and B were not being paid back as requested, telling them that he would check with the insurance companies about the annuities he claimed he purchased for them and promising to pay them back with interest if they did not contact law enforcement about the money he owed them. The total amount of funds from Clients A and B that Rosenbaum converted for personal use was $225,214.

### C. Stipulated Offenses #2 and #3

Rosenbaum did not just steal money from clients. He also stole money from the federal and state governments. In particular, in March 2021, Rosenbaum filed three PPP loan applications, one in his name and two in the names of close relatives (unbeknownst to them). In the applications, Rosenbaum falsely represented that each of the three individuals was a sales representative who had made thousands of dollars of income from that business in tax year 2020 and needed the PPP loan proceeds to support the ongoing operations of the business. As a result of the fraudulent representations Rosenbaum made in those applications, he received a total of $53,537 in PPP loan proceeds, which he used for his own personal benefit.

Between May 2020 and September 2021, Rosenbaum similarly filed fraudulent claims with the Illinois Department of Employment Security ("IDES") seeking unemployment insurance benefits for him and a close family member (unbeknownst to her). In the applications, Rosenbaum falsely represented among other things that he and the close family member had both been terminated from employment without

fault, were able to work, and had been actively seeking work. As a result of the fraudulent unemployment claims he filed for himself and the close family member, Rosenbaum received a total of $65,826 in unemployment insurance benefit funds to which he was not entitled and that he used for his own personal benefit.

**Objections to PSR's Guidelines Calculations**

The government agrees that Rosenbaum has a criminal history category of I but disagrees with two of the Guidelines calculations in the PSR: the applicable enhancement under Guideline § 2B1.1(b)(2) and whether Rosenbaum is a zero-point offender under Guideline § 4C1.1(a). PSR ¶¶ 40-53. Accordingly, the government submits that the total offense level after acceptance should be 33, and not 29 as calculated in the PSR. With a total offense level of 33 and a criminal history category of I, the applicable Guidelines range would be 135 to 168 months' imprisonment.

A. **Rosenbaum's Offenses Caused Substantial Financial Hardship to Five or More Victims.**

The Probation Office and Rosenbaum both agree that, at a minimum, a two-level enhancement under Guideline § 2B1.1(b)(2)(A)(i) is appropriate because Rosenbaum caused financial loss to more than 10 victims. *Id.* ¶ 43. However, the Probation Office disagrees that the four-level enhancement under Guideline § 2B1.1(b)(2)(B) applies here. *Id.* That is incorrect because, as the government has shown, Rosenbaum's conduct resulted in substantial financial hardship to at least five victims. Application Note 4(F) to Guideline § 2B1.1 provides a non-exhaustive list of factors that the Court should consider in determining whether a victim suffered substantial financial hardship, namely, whether the offense resulted in the victim (i)

8

becoming insolvent, (ii) filing for bankruptcy, (iii) suffering substantial loss of a retirement, education, or other savings or investment fund, (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans, (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home, and (vi) suffering substantial harm to his or her ability to obtain credit. Here, at least one of the above factors applies to each of the six victims referenced below.

### 1. Victim R.N.

Victim R.N. (referred to as Victim C in the indictment) gave Rosenbaum $102,597 to purchase an annuity so that he would have money to care for his wife, who had a serious medical condition. As a result of Rosenbaum's theft of Victim R.N.'s money, Victim R.N. was unable to pay for a long-term facility that was closer to his home and had to place his wife in a facility that was farther away, which meant that Victim R.N., who was in his 80s, could not visit his wife as often as he wanted before she passed away. Without the money Rosenbaum stole, Victim R.N. also had to borrow money from others to pay for the less expensive, more distant facility he placed his wife in and plans to attempt to pay that money back even in his advanced age. *See* Exhibit B, R.N. Interview Reports; PSR ¶ 121; Application Note 4(F)(iii), (v) (substantial financial hardship can result when there is a substantial loss to a retirement or savings fund or substantial change in living arrangements).

### 2. Victim S.H.

Victim S.H. was Rosenbaum's housekeeper, is a single mother, and has known Rosenbaum for 10 years. She knew he was involved in the insurance/investment

business and asked him to invest her savings with the hope that she could use that money to retire. Victim S.H. has chronic health issues that cause her debilitating pain and other ailments, particularly when she is stressed. Despite knowing all of that, Rosenbaum stole approximately $80,000 from Victim S.H. As a result of that theft, Victim S.H. will not be able to retire and as she told this Court "may have to work until I die[.]" PSR ¶¶ 32, 121; Application Note 4(F)(iii), (iv) (substantial financial hardship can result when there is substantial loss of a retirement fund or substantial change to employment, such as postponing retirement plans).

### 3. Victim T.N.

Victim T.N. has known Rosenbaum for almost 40 years and was a romantic partner. Victim T.N. is also a single mother with a teenage son. When Victim T.N.'s mother passed away in December 2021, she inherited a sum of money that she wanted to use to purchase a home for herself and her son. She went to Rosenbaum for advice because she knew he was a financial planner, and he convinced her to give him $50,000 to invest in a short-term annuity to help her purchase a home. Rosenbaum never purchased that annuity; instead, he pocketed the money. As a result of that theft, Victim T.N. was unable to purchase the home that she found and wanted. Rather, she had to take out a personal loan at a high-interest rate to purchase a smaller home, which has caused her undue financial burden that she would not have had if she could have used her $50,000 inheritance to purchase a home. *See* Application Note 4(F)(v) (substantial financial hardship can result when there is a substantial change in living arrangements, such as relocating to a less expensive

home). Rosenbaum later paid back some of the money he stole from Victim T.N., but it was too late for the house she wanted with that money.

### 4. Victim S.F.

Victim S.F. has known Rosenbaum and other members of his family for years and considered Rosenbaum a friend, sometimes talking to Rosenbaum several times a week. Victim S.F. gave Rosenbaum $75,000 to purchase an annuity that Rosenbaum never purchased that was supposed to serve as retirement income for Victim S.F. Victim S.F. did not have a lot of money saved for his retirement, and the $75,000 that Rosenbaum stole would have been one year of retirement income for Victim S.F. that he cannot get back given his advanced age. PSR ¶¶ 31, 121; Application Note 4(F)(iii) (substantial financial hardship can result when there is a substantial loss to a retirement fund).

### 5. Victim K.C.

Victim K.C. has known Rosenbaum for several years and had Rosenbaum help her with the inheritance she received after her mother passed away. Victim K.C. ultimately gave Rosenbaum $195,214 to purchase annuities and make other investments, which Rosenbaum did not do. As a result of Rosenbaum's theft, Victim K.C. had to pay for federal tax payments and other expenses with a credit card that she has not yet paid off. Victim K.C. believes it will take her years to pay off her credit card charges, none of which she would have had if Rosenbaum hadn't stolen her money. Furthermore, Victim K.C. has had to sell jewelry and other items to make ends meet and is concerned she will have to sell her home because she cannot afford it without the money she expected to have from her investments with Rosenbaum.

11

PSR ¶¶ 33, 121; Application Note 4(F)(iii) (substantial financial hardship can result when there is a substantial loss to a savings or investment fund).

### 6. Victim C.P.

Victim C.P. gave Rosenbaum $100,000 (part of her inheritance after her father passed away) to purchase an annuity that Rosenbaum never bought. Victim C.P. suffers from a number of mental and physical ailments, and the money Rosenbaum stole could have been used to rebuild Victim C.P's home after it was damaged by a hurricane, pay for medical bills, and pay for college tuition for her kids. PSR ¶¶ 29,121; Application Note 4(F)(iii), (v) (substantial financial hardship can result when there is a substantial loss to an investment fund or substantial changes to living arrangements).

### B. Rosenbaum Is Not an Eligible Zero-Point Offender.

The PSR incorrectly deducted two points from the total offense level by concluding that Rosenbaum was a zero-point offender under Guideline § 4C1.1. PSR ¶ 52. To qualify for this deduction, Rosenbaum could not have caused substantial financial hardship. *Id.* As set forth above, at a minimum, Rosenbaum's offense caused substantial financial hardship to at least one victim. As a result, he is not entitled to the two-point deduction.

### Application of § 3553(a) Factors

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. The relevant § 3553(a) factors in this case include: (1) the nature and circumstances of the offense; (2) defendant's history

and characteristics; (3) the need to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense; and (4) the need for restitution. The government submits that those factors strongly weigh in favor of a Guidelines sentence.

### A. The Nature of Rosenbaum's Crimes

Rosenbaum's actions weigh in favor of a Guidelines sentence because his crimes were very serious. There are several aggravating factors specific to his offenses that weigh toward imposing a serious sentence of incarceration.

First, in many ways the Guidelines fail to capture the seriousness of the fraud Rosenbaum engaged in. Not only did he take his clients' money, but he also left those clients without annuity coverage and ultimately with little to none of the money they invested with him. As set forth above, Rosenbaum's theft of significant amounts of money from his clients has left a number of them in dire straits, having to work or come up with other ways to make ends meet or pay for certain expenses.

Second, Rosenbaum continued committing his financial-fraud scheme even after he was indicted and released on bond by the Court, and after he had lost his insurance license. What did Rosenbaum do in response: he opened up a business in his mother's name and obtained an insurance license in her name as well so that he could continue defrauding others by claiming to purchase annuities or make other investments for them. His disregard for others' money, the law, and this Court's conditions of release speaks volumes to the serious nature of his crimes and his total lack of respect for the criminal justice system.

Third, Rosenbaum's crimes were not limited to defrauding his clients. He also defrauded the government when he fraudulently applied for and received PPP loan funds and unemployment insurance benefits for both himself and some close family members. In doing so, Rosenbaum took money that did not belong to him and could have been used by someone else who really needed it.

Fourth, Rosenbaum's criminal conduct was not a one-time lapse in judgment that was a product of passion or anger. Instead, his actions represented a repeated, calculated course of fraudulent conduct that took place over a long period of time. Greed and an arrogant belief that he would not be caught or significantly punished are the only explanations for why Rosenbaum chose to engage in this fraud.

Finally, it is unclear if Rosenbaum even accepts responsibility for his actions. When the Probation Office interviewed him about his crimes, Rosenbaum blamed his "father's enabling parenting style" as the reason he decided to steal from others so that he too could "enable his girlfriends in a similar fashion." PSR ¶ 88. Wanting to provide for or enable his girlfriends is an especially weak explanation for engaging in a years long scheme to defraud long-standing clients and friends. Also worth noting is that enabling girlfriends is zero justification for continuing to engage in fraud after being released on bond by the Court.

### B. Defendant's History and Characteristics

The PSR sets forth in detail Rosenbaum's history and characteristics, including aspects of Rosenbaum's prior employment, his childhood, and his family

situation. Nothing in the PSR presents mitigating factors that even begin to explain why Rosenbaum chose to engage in prolonged fraudulent conduct.

The most notable fact about Rosenbaum's history and characteristics is that he continued engaging in this fraud after regulatory action and after having been charged in this case. As is clear, having his license revoked had no effect on Rosenbaum's mindset—instead, he continued his insurance fraud after he was no longer licensed. Moreover, an arrest, indictment, and order from a federal district court judge was not enough to stop him from engaging in fraud. That these measures did not slow down Rosenbaum's fraudulent conduct says much about his view of the seriousness of his conduct and the respect he has for the law.

### C. The Need for Deterrence

The need to afford adequate deterrence is a critical part of the sentence to be imposed in this case for a number of reasons. First and foremost, Rosenbaum is the exact type of defendant who committed the exact type of crime where deterrence matters. White-collar crime is often committed by educated and affluent defendants. In this case, it was not a crime of need or passion. Crimes of this nature can be deterred with punishment that includes terms of incarceration. Other would-be defendants who are thinking about committing frauds of this nature will think twice if they believe their actions will have serious consequences. These consequences cannot simply be disgorgement of ill-gotten gains or the payment of fines. Instead, the consequences must include serious sentences of incarceration to be effective in deterring others.

In addition, fraud such as this one involving misappropriation of client and government funds can be difficult to detect and prove, and lucrative to the participants. Thus, it is important that sentences in this and other fraud cases serve to deter individuals from committing the same crime. *See United States v. Heffernan,* 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

A sentence within the applicable Guidelines range in this case would deter others from committing fraud, promote respect for the law, and provide just punishment for Rosenbaum. Such a sentence would be a strong message to Rosenbaum and other fraudsters that their conduct is serious and will be punished accordingly.

### D. Restitution

For the reasons stated in the Government's Version of the Offense, Rosenbaum should be ordered to pay $1,150,086 in restitution. The restitution should be made payable to the victims listed in paragraph 121 of the PSR.

### E. Supervised Release

The government has no objection to the term of supervised release and the conditions of release that the Probation Office has recommended in the PSR.

**Conclusion**

For the foregoing reasons, sentencing Rosenbaum to a term of imprisonment within the applicable Guidelines range, followed by a three-year term of supervised release, restitution in the amount of $1,150,086, and a $100 special assessment is fair, reasonable, and sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Dated:  January 30, 2024　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　MORRIS PASQUAL
　　　　　　　　　　　　　　　　　　　　　Acting United States Attorney

　　　　　　　　　　　　　　　　　　By: */s/Prashant Kolluri*
　　　　　　　　　　　　　　　　　　　　　PRASHANT KOLLURI
　　　　　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　　　　　219 South Dearborn Street
　　　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60604
　　　　　　　　　　　　　　　　　　　　　(312) 353-5300